The Illinois Appellate Court, 5th Division, is now in session to offer Justice Mathias W. Gilroy's resignation. Please be seated. The clerk will call the case. 1-22-1293, Dr. William A. Field v. Mavrakis. Good afternoon, everyone. Welcome to the Illinois Appellate Court, 1st District, 5th Division. We're going to ask that the attorneys who are here to argue please step up briefly to introduce yourselves. Beginning with counsel for the appellant. Good afternoon, Your Honors. My name is Lynn Dowd for the appellants. Thank you. Good afternoon. Rachel Kiley for the appellees. Kiley? Yes, I am. And we're going to ask both counsels, we have a very loud ventilation system in this room, so please speak about five levels louder than you're doing right now and speak right into the microphone when it's your turn. All right? All right. We'll allow 15 minutes per side and we'll give an extra five minutes to the appellant for a reply at the end. And Ms. Dowd, you may proceed when ready. Thank you. May it please the Court. Again, for the record, my name is Lynn Dowd. On behalf of the appellants, I'm here today along with my co-counsel, Robert Napleton. Your Honors, we submit that this is a very straightforward case, warranting reversal, being up on summary judgment. They have both elements upon which the Court entered summary judgment. Respectfully, we're erroneous. The Court erred on the facts with respect to how this elevator operated and her understanding that she thought the mechanical systems rendered the incident an impossibility. And we also submit the Court erred in her understanding of common carrier law, that notice of this incident was a conditioned precedent to liability. With respect to the facts, I'd just like to summarize that, ironically, six years ago today, Ms. Mayfield entered an elevator owned by the defendants. And while she was in the elevator, she went up to the fourth floor. Another passenger was in the floor with her. And as she went to exit the elevator, the doors opened. The other passenger made a remark that she was on the wrong floor. And the facts suggest that she hit another button, thereby causing the door to smash into Ms. Mayfield, causing serious injuries, head, neck, teeth, neck injuries, et cetera. The only expert of record who explained how this happened was the plaintiff's expert, John Donnelly. He's an engineering expert. His testimony was unrebutted. He explained and testified that what happened here, where he went back after the incident in 2019, to test the elevator and to perform a simulation, which no other witness did, was that he found that the dwell time of the elevator, the period of time from which a passenger is allowed to exit the elevator without incident, did not comply with industry standards. He also – Let me ask you this, Dowd. What is the appropriate standard for us on the issue? Was the owner of the building required to follow only the city of Chicago code or industry standards, and which one in this situation would be stricter as to the injuries at issue? The short answer is no. The defendants were not simply allowed to follow the city code. They were subjected to industry standards, and that is, again, according to our Illinois Supreme Court precedent we've cited, but also Mr. Donnelly, wherein the Supreme Court said experts can testify to what are the applicable standards to which a common carrier or another defendant is subject. And, again, Mr. Donnelly said that he identified the national industry standards to which the defendants were subject. His testimony is uncontroverted on that level. But he also – It may be uncontroverted, but isn't he necessarily looking sort of retrospectively back in time as to rendering an opinion as to what the condition of the elevator was a year before? That is correct, Your Honor. That is correct. But that was based on Ms. Mayfield's testimony, the wiring diagrams. He was given a variety of objective points of data that he examined, and the defendants did nothing to counter to suggest that two years previously the elevator did conform to those standards. Their whole argument was predicated on the electronic sensor. And, actually, they did try to argue that the city code, that they complied with the code. But Mr. Donnelly, he testified that the city code did adopt national industry standards, and he identified those, and we've identified them in our brief. But he also said, based on his examination of this elevator, it did not comply with even the city code in a whole variety of respects. Everything was old, original. It was not up to date, which evidenced that this defendant did not meet its legal duty to stay abreast of industry standards, to bring this machine compliant with industry standards, which is the duty to which every common carrier is subject. What do we have in this record that links the testimony of the expert and any other evidence that was submitted to the specific defect that caused the injury at issue here? Okay. First of all, with Mr. Donnelly's examination, he explained the concept of the dwell time and how the elevator did not perform. But he also examined it, and he said there was no safety edge or mechanical edge. And he explained that would be the device where if someone stepped into the elevator, it would cause the doors and it bumped them to retract. He said at that time there was no mechanical edge, and at some point there was only an infrared sensor. And he explained how the sensor did not operate like a safety edge did, that the sensor required that the passenger exiting walk into a zone of detection before it would be activated, but that it did not even have an immediate retracting function. The mechanical edge, as we all experience in our common use of elevators, most elevators today, where you step in and if it bumps you or you push it back, it will retract. But she, Ms. Mayfield, never entered the zone of detection. And from all of the witness testimony, including hers, which is evidence, she entered, the other passenger pushed the button, and according to Mr. Donnelly, that canceled the dwell time, and it caused that door to come back and smash on her. To answer Your Honor's question, though, there's other evidence of record. Mr. Navrakis himself, the defendant, he testified that at the time of the incident, there was no device on his elevator to stop the door from hitting the passenger. He's the owner of this elevator. Who knows it better than him? He bought the building in approximately 2005, from the record. And he said he inspected the elevator at that time. He testified, and other witnesses corroborated, he only had repairs done on an as-needed basis. He never had professional inspections. He never had inspections to determine what were the industry standards as they changed from time to time, whether you're on an elevator, in a car, on an airplane. You don't get to send an airplane out in this country that has never been brought up from 2005 technology or previous to that. Is there any requirement in the city of Chicago that you maintain, that an elevator owner maintain, like a logbook, a maintenance logbook or anything like that? Is there a separate obligation to maintain that? As far as business records? Right. I do not recall specifically, Your Honor. I mean, the codes were in there, but as there were inspections, there were, in fact, there was some documentation to when inspections were performed. Whether the owner had to maintain a separate log, I can't fairly answer that today, to be perfectly candid. But to go back to whether evidence of record substantiates Mr. Donnelly's testimony, Mr. Druffel, these are all American Hoist employees or even the owner, and they're the ones who perform the maintenance on the elevator. None of them were disclosed or qualified as experts. None of them rendered expert opinion. But the fact testimony is compelling and supports a reversal. Mr. Druffel testified that a passenger hitting the button could cause the door to hit the other passenger leaving, just as Ms. Mayfield described. He said the electronic eye or the sensor upon which the circuit court found this positive would not stop this from happening. He said there was no mechanical edge. That's his testimony. Mr. Pruitt, another American Hoist employee, said if the elevator was operating as it was supposed to, the injury would not have occurred. But he could, none of them could testify to exactly the condition on the date in question in 2017. Is your contention that this non-expert testimony was, should have been considered by the trial court in determining whether there is material issue, genuine fact, preventing summary judgment? That it should not have been considered, Your Honor? It should have been. Oh, absolutely. That's the standard evidence of record. And we have the uncontradicted expert, but the fact witnesses are certainly important evidence that the trial court is duty-bound to consider. And I submit all of these evidence support a reversal. Your opponent is the one witness, Ms. Hamilton. They claim that her testimony should not be considered because she did not come on the scene until a year after the accident. She's not an LA expert by any stretch. She's simply an employee in the building. Do you concede that at least Ms. Hamilton needs to be segregated out and not considered? No, I do not, Your Honor, for several reasons. If not, why not? Well, first of all, the defendants took her deposition, found her to be an important witness, and they cited her in support of their motion for summary judgment. But her testimony is important. Perhaps, you know, we're talking about weighing the testimony, but she provides testimony corroborating Ms. Mayfield's testimony that this elevator was in horrible condition, and it refutes Mr. Mavrakis, the defendant's testimony, that he had repairs always done on an as-needed basis. She provides testimony that even when she came on the scene in 2018, no, repairs went unattended. This elevator was in a deplorable condition. People were getting injured and hurt in this elevator all the time, and even in the stairs when they couldn't use the elevator. There was mold, et cetera. So her testimony is fair to consider. It's important. It's not dispositive, but I think it was fairly considered. But the other witness is Mr. Anderson. He testified that he understood there were industry standards applicable to this elevator, although he couldn't cite them. But he did provide testimony that industry standards applied wherein doors were not supposed to hit passengers exiting them, that there were standards in place. Counsel, were you able to determine whether or not there was a contract for maintenance of the elevators, in effect, at the time of the injury? I believe, Your Honor, that the witnesses from American Hoist did not identify a contract per se. They had an arrangement where they were called on an as-needed basis, and over time they responded when Mr. Mavrakis told them to perform a repair. And would the records that somehow were missing, would they have been records that would have related to whether or not there was ongoing maintenance of the elevator? Oh, okay. That's a separate issue, if I may address that. We, during discovery, we filed a motion to produce all business records pertaining to this elevator. Mr. Mavrakis testified he destroyed everything. But he did also testify that he did receive complaints and that they were oral, but the written complaints, and then he got written complaints and he threw them out. So, here we are. They moved for summary judgment. They, thereby, accepted the Pedrick standard that all the acts and omissions, that is all the evidence of record, is to be construed in the light most favorable to hear the plaintiff. So, it's very important in the court's consideration that he went out of his way to destroy his business records. He admitted to that. Was there a legal obligation? That was what I was trying to understand. Is there a legal obligation for him to maintain those records? I mean, certainly if there's litigation, he has to maintain records. But absent that, is there some ordinance that requires him to keep all maintenance records or something like that? Yes, Your Honor. And I believe we cited by, I don't know of an ordinance in Chicago, but there is by case law and the business law, if we look at it, there is case law that says there's a duty, if you're running a business, you have a duty to maintain proper records. And, you know, there's statutes applying to businesses, too, on what their obligations were. He was the one who incorporated himself as an LLC. With that comes certain obligations and responsibilities. But now when we're in litigation and he's claimed he's the one claiming I didn't have notice of this defect at all, well, then that's an issue to be proven or disproven. And so we're like, okay, you claim you don't have notice. Well, then produce the records. Well, he conveniently destroyed them all. He didn't just, you know, have some and lost others. All of them were destroyed. He never kept business records. Now, that may not be dispositive, but, again, in summary judgment, we submit we were entitled to an inference and an adverse inference under Peddrick that those records may well have demonstrated he did have notice of this incident. And is your position that inference is sufficient to overcome summary judgment or is it just added to the pile of other evidence that would be created? I think it's one of many relevant facts. Do you agree that if we were to reverse, the spoliation of evidence issue goes away? At least. Well, depending on what you said in your opinion, I mean, whether this question is a fact. Because you seem to be arguing that the destruction of the records somehow triggers the, you know, the negative inference rule, you know, the missing witness rule, essentially, or the destruction. Similar to that, yes. Yes, similar to that. And that that is where summary judgment, okay. If this case were to be reversed and go back to trial, then you get the negative inference. I think we could still argue to a jury, Your Honor. I think the fact that he destroyed relevant, potentially relevant evidence. I mean, who does this in business? Who destroys all their records? Well, we know Mr. Mavrakis does, but that's not normal practice. And I think the jury is entitled to hear that. I have a terrible record, keep your side. Well, terrible is not affirmatively bad, necessarily. Just a real practical question. There were, the summary judgment hearing or procedure was rather extended, right? There was motion, motion to consider. There was a lot of time put into this. Well, there was a big gap between, well, we had a motion for summary judgment, the motion to reconsider, and then the court's ruling. And, you know, I mean, I know judges are busy, but we had no idea why, what the delay was in getting our decision. So that accounts for the passage of that time. Just out of curiosity, how long would it take to try a case like this? Well, I have my trial expert with me today, so. Let the record indicate, counsel, that it was. Two days, two weeks. Two weeks, okay. I was wondering if it was two days or two weeks. I mean, do they have a plan for how they prepare the case? That's not my wheelhouse. That's his superpower. But thank you. In any event, I think there is an abundance of evidence that demonstrates the existence of genuine issues of material fact as to what happened with this elevator, thereby defeating the circuit court's conclusion as a matter of law that this electric eye rendered the incident an impossibility. No one disputes that Ms. Mavrakis was injured. So something happened to her in that elevator. You've got about three minutes left. Three minutes, okay. So, Your Honors, lastly, with respect to the common carrier law, I would just like to reiterate that this is the highest duty of care that the defendant owed. It was a duty where he could not sit by and just react. The common carrier duty of law is not a one-bite-free, where we wait for someone to get injured, and then we figure out why, and then he was then duty-bound to go do a repair. He had an affirmative obligation to stay abreast of industry standards, to hire someone to do a professional inspection, and if it was out of compliance, to bring it in compliance. For this defendant to suggest he was an unsophisticated businessman simply is unsupported by the record. The evidence shows he owned multiple buildings. He had multiple businesses. He was a very savvy and sophisticated businessman who just didn't want to pay to fulfill his duty of care. Unless the Court has any questions, I thank you very much for your attention, and we request a reversal. Thank you, Ms. Dowd. Thank you. Ms. Kiley, you may proceed when ready. Thank you. Good afternoon again. For the record, I am Rachel Kiley, and I represent the Appellees in this case. It's our position that the summary judgment decision by the Court should be affirmed. There were more than 10 briefs that the Court considered and more than two hours of oral argument on this matter on an exhaustive record. One of the things that I would like to point out that I heard Ms. Dowd state is the difference between a mechanical safety edge and an infrared system, because I think that's very important, and I think that there's a misunderstanding here, and I want to make sure that the Court's clear on this issue. A mechanical safety edge and an infrared system are two different systems. You cannot have both at the same time. It's an either-or situation. The mechanical safety edge is the more obsolete of the two. It's where you actually have to get hit by the door in order for the door to retract. Their own expert, Plinkett's own expert, Mr. Donnelly, said that the infrared system, which is what Mr. Mavrakis, my client, had at the time, is the more reliable and the better of the two safety features. And the reason being is that there's an electric eye that runs down the entire elevator door so that the second someone crosses that beam, that electric eye, whether it's their foot, their hand, their papers that are in front of them, the doors will immediately retract. It doesn't have to hit you in order to retract. It immediately retracts within a matter of seconds. So that's the testimony here, that there was an infrared system. It's the better of the two. It's the more state-of-the-art according to their own expert. But we know that something happened here, right? I mean, you're not disputing that the plaintiff was injured in the elevator. Plaintiff alleges that she was injured, and according to Plinkett's expert, there had to be a very unique remote set of facts in order for this accident to play out, which is our contention that we did not have notice that the injury here was foreseeable under that precise set of facts. Isn't the intervening? There was an intervening action. Correct. That is believed to cause the, I guess, the mechanical arm, mechanical edge not to retract because someone pressed the button for my next stop. My stop is. The testimony was there were two people on the elevator. One said, oh, I forgot to push the button. I pushed the button, and then that created some hiccup, and it didn't work. Respectfully, there would have been a hiccup, but that's not how it takes place. So what happens, according to their expert, what happens is if, so there's three things that go into a door, okay? The first one is velocity. That's the door speed. The testimony of the American hoist people, which were disclosed as Illinois Supreme Court Rule 213-F2 witnesses and Mr. Donnelly is that the door speed was appropriate. It was the correct door speed, and that door speed does not change. That's number one. Number two, there's the infrared safety system. As soon as it detects someone in the zone of danger, the doors immediately retract, which Mrs. Mayfield testified that the doors hit her. They retracted. Mr. Donnelly says that she wasn't in the zone of detection, okay? So you said that the use of the infrared beam goes through the entire plane of the elevator door. Correct. And it is your, because I think one of my colleagues asked when you were alleging that she did not get injured in the elevator. So is it your coming back to that question saying that she did not get injured on that date and that time by the door? It's our contention that she did not get injured by the door. Which was the answer that he asked before that you didn't give him. I'm sorry. However, obviously she testified to that. So that's the record that we're dealing with, and the facts get construed in the light most favorable to the non-movement. So we're assuming just for summary judgment that the accident did occur, okay? There's still the fact that we did not have knowledge or notice that this would be an injury that could occur given the facts. If a plane who has the misfortune of being injured in this bizarre way is just out of luck, it's the next, the second, and third plane that would have a cause of action. Kind of a variant of the old one-house rule right from the 19th century. Well, Your Honor, even with the common carrier liability, it's not strict liability. So there has to be some foreseeability. And under this circumstance, there just was not. We have the state-of-the-art safety feature on the door. And the third element of what goes into the door closing, which I didn't get to, is dwell time, okay? So dwell time is the amount of time that passes before the door starts to close. Now, what part was not foreseeable? The part that the dwell time would not operate and allow a person to safely extricate themselves from the divorce, from the divorce, from the door, or the fact that the elevator was regularly in need of maintenance and was not properly being serviced. Which part was not foreseeable? The part that was not foreseeable is how the accident allegedly occurred when you have the state-of-the-art system in place and you have a dwell time of seven seconds, which, by the way, is more than double what the City of Chicago Code requires. What was not foreseeable was that this precise set of circumstances would occur, that the doors had to be fully open and someone only inside the elevator, not outside, would have to press the button from within the elevator at the exact time that the doors are fully open because that apparently overrides the dwell time, okay? And the code does not specify that. The code that didn't even apply to us at the time only says that it needs to be open for a minimum of three seconds. Mr. Donnelly conceded that our dwell time was seven seconds. The City of Chicago Code excused your elevator from inspections and from the dwell time requirement. Is that because of the size or how is it that this elevator was not required to have the little placard that appears on the elevators inspected by the Department of Buildings on this date? We did not have that, Your Honor. In fact, City of Chicago records were produced in this case. It's part of the record. Prior to the occurrence and issue and for months afterwards, it was determined that this was up to code in terms of how the door operated and the safety of the elevator. So we were code compliant. There was not a code violation in that regard. And Gary Bach, who was the city inspector, was also deposed and testified that any of the issues that the City of Chicago had with this elevator after the fact were not related to safety of the door or anything along those lines. So while there's been a lot of information by Ms. Dowd about the fact that there were all these problems with the elevator, what we're looking at is what was allegedly the defect on that day. And I would submit to you that after taking a lot of time to consider all the evidence and to read all the briefs and the testimony, Judge Harvey appropriately found that there was not notice of the alleged dangerous condition and that this accident was not foreseeable. In fact, the American Hoist representatives who provided maintenance to my client's elevator testified that this accident was an impossibility. And the reason why we cite that is because if the maintenance people, with the benefit of hindsight, believed that this accident was impossible, then how was my client supposed to have the foresight to guard against something that is not even in the building of Chicago Code? Don't we have other evidence in the record where someone is opining that the injury was possible? Your Honor, again, it's taken out of context because the testimony is that there was this infrared system. And if that's inoperable on the date in question, the elevator does not operate. The doors would not shut at all, which is our evidence, unequivocal evidence, that the infrared system was operating. So it really becomes an issue of, well, should we have known that the dwell time is shortened under this precise factual scenario that the American Hoist people didn't even contemplate, especially because of the infrared system? Because all of that taken together made it reasonable to think something like this would not occur. Let me try to pin you down on something here. We have a dispute between the parties here. First, part of my question is, do you concede that this being an elevator injury, we are still governed by the common carrier, which is the standard, which is the highest level of diligence? Yes, Your Honor. Okay. I think it was contemplated for a hundred years before dropping, but yes. They still seem to be valid. Correct. And then you frame the case under the rubric of notice, that Mr. Provoca should have had specific notice that the elevator was doing this all the time, or did it sometimes, or it did it enough times. Your opponent takes the position that under common carrier, that that's not the standard. That it's one of foresight. Correct. That you need to maintain the elevator sufficiently so that it meets industry standards. Why is your view the one that should prevail on that issue? Because on common carrier law, we're still not at a strict liability standard. Quite candidly, when I look at the case law, there is no definition of foresight. It seems to be notice and foreseeability. Even if foresight is something less than notice, the fact of the matter is, even with all the foresight in the world, this is not something that we would have ever contemplated, given the safety feature that was in effect, and given the fact that the code itself says seven seconds, or I'm sorry, excuse me, three seconds, and we were at seven seconds, the fact that the American hoist people don't even contemplate this with the benefit of hindsight, I don't know what more my clients could have done under that scenario. They're required. The common carrier act requires that the carrier provide the opportunity to safely alight. That's what is required. So that is what more your client could have done. And they are not just required to use, notice is not anywhere in there, it is to avoid reasonably foreseeable injuries, or causes of injuries using extraordinary diligence, not average, everyday diligence, because the danger and the magnitude of that danger is very, very, very significant. And so they are required to use extraordinary diligence in making sure that people are safe. Your Honor, I think when it comes to this particular issue, and the doors closing, I do agree with you that it's common carrier liability. The elevator cases deal with elevators that are dropping to the ground, which is something very different. You don't get on and off the elevator when it's dropping. Even so, Your Honor. At the end of the day, this was not something that was reasonably foreseeable, given the features that were in place, the fact that this had never occurred before, the fact that it was inspected by American Hoist every time it came out to the property, the fact that the dwell time did meet the code requirements. Mr. Donnelly himself says that this safety modification that he says is codified was not applicable to us at the time. So if American Hoist doesn't contemplate this as being something that's required because of the safety feature our door has, and if the code doesn't specify it, I don't understand or I can't contemplate a situation where we're supposed to have the foresight to guard against it. It's impossible given the situation, and ultimately it then imposes a strict liability standard on us, which is not what the case law says. You have about two minutes left. Okay. With respect to the business records, the case law cited by plaintiffs that indicates that there's a duty to preserve business records, there's some conflating there of duty, where plaintiff also indicates that because we are a common courier, we have the utmost duty to retain these documents. That's not what the case law says. The Fontana case that they cite talks about maintaining corporate documents, but that's a very different case than what we have here. It was a piercing at the corporate bail case, and one of the factors that's looked at in that consideration is whether there's business or corporate records that are maintained to show that you're not one and the same, so it's distinguishable. And that case, or any case that has been cited to them, indicates that documents pertaining to written complaints about something needs to be retained. That's not the case law. Moreover, the testimony in this case is that when there was a complaint and it was oral, Mr. Mervakis would call American Hoist. American Hoist would go out there, and they would ride the elevator, they would look at it, they would repair it, and in some situations, such as the guard brushes, they would make recommendations as to what should be added. If there was a written complaint, Mr. Mervakis would do the same thing. He would pick up the phone, he would call American Hoist. Once American Hoist went out there, he would get rid of the written complaint because the issue had been addressed. The records of American Hoist indicate that they were out there 55 days before the alleged incident. They did a Category 1 inspection. There was nothing wrong with this elevator in terms of the safety of it and the door operation. I'm going to ask you to get ready to conclude there. Okay. Which just goes to the fact that there was not notice of this particular defect, and there was not foresight of this particular defect, if that's the standard that this Court believes should be applying. Thank you. Any other questions from the panel? No. Thank you. Ms. Gow, do you have five minutes for rebuttal? Thank you, Your Honors, and I will do my best. First and foremost, it doesn't matter if counsel doesn't understand how a defendant could have complied with its duty. There's a simple answer. He could have fulfilled his duty by paying for one comprehensive professional inspection by a qualified elevator company. He never did. That's the unrebutted testimony of record. He only did, allegedly, repairs on an as-needed basis, and that's even in dispute. Secondarily, the central issue with respect to the elevator is not the electronic sensor. Mr. Donnelly provided testimony that defendant deviated from the applicable industry standards by not having the elevator brought up to the dwell time requirements and mechanical systems so that when someone pushed the button, the dwell time would not be canceled, and that's what happened here. The mechanical edge and the electric eye have nothing to do with dwell time, and Mr. Donnelly's testimony makes that clear. The noncompliance, the negligence was the failure to bring this elevator in conformity with the then applicable standards to dwell time, and none of the maintenance people ever looked at dwell time. Mr. Pruitt testified that this Category 1 inspection had nothing to do with that, had nothing to do with a comprehensive inspection of this elevator, whether it complied with this end industry standard or all other industry standards, for all we know. That's not in dispute. But according to Mr. Donnelly, there's still deficiencies with respect to the city code. Now, the maintenance people, no one provided testimony, no one, that this elevator had a state-of-the-art electronic sensor system on June 13, 2017. He brought in some infrared sensor, but I don't even recall the plaintiff's expert saying this was state-of-the-art. That's an unfair editorializing of the evidence. At some point, it was replaced and put in, but no one could testify to whether there was any sensor in place on June 13, 2017. And Mr. Mavrakis, it really doesn't matter because he said there wasn't. He's the owner. He said there was nothing there. So that's all a red herring. But the bottom line is there's evidence to support a finding that they were negligent because this elevator did not have the proper dwell time to allow Ms. Mayfield and any other passenger ample time to exit that elevator safely. How is foresight defined? It's defined in the case law. And this goes back 100 years. Again, it's not that you have to have notice. It says that you have to do all that is reasonably necessary. Some decisions say you need to take extraordinary measures, but that's not the same as strict liability. That term is being bantered about unfairly. As we know, strict liability deals with product liability law. Here, there's a very high duty of care. If this defendant didn't want to do anything to comply with that duty, he had no business owning an elevator. The, you know, even Mr. Anderson, just lastly, he only looked at the elevator three weeks before his deposition. He didn't even know it was on there. So all of their fact witnesses were asked to make assumptions. That's not evidence sufficient to support summary judgment as a matter of law. Therefore, your honors, I submit we're entitled to a reversal. And I thank you very much for your attention. Thank you, counsel, for your arguments. The court will take the matter under advisement. With that, the court stands in recess.